EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Queens Developers, Inc. y 1014 Luquis, Inc.<br><br>    Demandantes-recurrido<br><br>        vs.<br><br>  Autoridad de Energía Electríca<br><br>    Demandados-Peticionarios | Certiorari<br><br>2005 TSPR 171<br><br>166 DPR \_\_\_\_ |

Número del Caso: CC-2004-152

Fecha: 21 de noviembre de 2005

Tribunal de Apelaciones:

        Circuito Regional VI-Caguas/Humacao/Guayama

Juez Ponente:

        Hon. FranK Rodríguez García

Abogado de la Parte Peticionaria

        Lcdo. Adalberto Alomar Rosario

Abogada de la Parte Recurrida:

        Lcda. Rebeca Barnés Rosich


Materia:  Incumplimiento de Contrato de Servicios y
        Daños  y Perjuicios


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Queens Developers, Inc. y
1014 Luquis, Inc.

    Demandantes-recurridos

       vs.                    CC-2004-152     CERTIORARI

Autoridad de Energía Eléctrica

    Demandados-peticionarios

OPINIÓN DEL TRIBUNAL EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a 21 de noviembre de 2005

Conforme los hechos del presente caso --los cuales no están en controversia-- M.D. Construction Company, Inc., en adelante, M.D. Construction y la Compañía de Desarrollo Corporativo adquirieron de USI Properties, Corp. un solar sito en Humacao con el propósito de construir el proyecto residencial conocido como Ciudad Cristiana.

El sistema eléctrico construido en el proyecto Ciudad Cristiana es uno semi-soterrado. Las líneas primarias son aéreas con transformadores adheridos a los postes. Desde los transformadores discurren líneas secundarias,

de forma soterrada, hasta un pedestal, y de ahí la línea va hasta la residencia.[1]

M.D. Construction y la Autoridad de Energía Eléctrica, en adelante la Autoridad, suscribieron una escritura de servidumbre de paso de líneas eléctricas[2], mediante la cual M.D. Construction cedía y traspasaba el sistema de distribución eléctrica construido en la finca a la Autoridad, una vez ésta última inspeccionara y aceptara el mismo. En virtud de la referida escritura de servidumbre, la Autoridad también se comprometió a darle mantenimiento a dicho sistema de distribución a partir de la fecha de aceptación del referido sistema.

La Autoridad inspeccionó las facilidades eléctricas realizadas por los desarrolladores del proyecto y, de conformidad con ello, emitió certificaciones de inspección aprobando las facilidades eléctricas --desde el sistema primario hasta la conexión con las unidades individuales--

---

[1] Se entiende por servicio bajo tierra o soterrado, aquellos alimentadores para el servicio eléctrico de los edificios, que sean instalados en tubería aprobada por la autoridad bajo tierra o en tubería empotrada en hormigón. Artículo 3.4 (1) del Reglamento Complementario al Código Eléctrico de Puerto Rico para la Instalación de Conductores y Equipo Eléctrico, Reglamento Núm. 4435 de 1987, aprobado mediante resolución del 11 de diciembre de 1990, en adelante, Reglamento Complementario. Dicho Reglamento fue derogado por el Reglamento Núm. 5676 del 29 de agosto de 1997. No obstante lo anterior, para resolver la controversia ante nuestra consideración aplicaremos el derogado Reglamento de 1987 ya que la vigencia de este nuevo Reglamento fue efectiva el 28 de septiembre de 1997.

[2] Escritura Núm. 37 del 7 de junio de 1979 suscrita ante el notario Adalberto Alomar Rosario.

instaladas originalmente en el proyecto.[3] Acorde con ello, la Autoridad realizó la correspondiente conexión de las instalaciones eléctricas interiores de las unidades de viviendas con el sistema de distribución eléctrica, aceptado por ella, y comenzó a dar servicio de energía eléctrica a dichas unidades.

En el año 1983, USI Properties instó un procedimiento judicial en cobro de dinero en la Corte de Distrito Federal para el Distrito de Puerto Rico contra la Compañía de Desarrollo Cooperativo y M.D. Construction, en el cual reclamó el pago de las sumas convenidas por la compraventa del solar. La Compañía de Desarrollo Cooperativo reconvino contra USI Properties y alegó que ésta última la engañó al representar que el terreno adquirido era apropiado para ser habitado por seres humanos, mientras la realidad era que el mismo estaba contaminado con mercurio. Posteriormente, el 26 de junio de 1985, la Corte de Distrito Federal dictó una sentencia en la cual determinó que no existía contaminación con mercurio en la propiedad.

En el entretanto, y como consecuencia de esta alegada situación, durante los años de 1985 al 1988 los residentes de Ciudad Cristiana fueron trasladados y relocalizados en unidades pertenecientes al Banco de la Vivienda. Como consecuencia de esto, la Urbanización Ciudad Cristiana

---

[3] Según la cláusula decimotercera de la escritura de servidumbre, la aprobación del sistema eléctrico por parte de la Autoridad era imprescindible para que el traslado surtiese efectos.

estuvo abandonada por más de cinco años, lo que ocasionó que el sistema eléctrico fuese vandalizado y que el mismo se deteriorara. Esta situación, causó que la Autoridad suspendiera el servicio de energía eléctrica y retirara de las facilidades casi la totalidad de los transformadores de distribución eléctrica, por razones de seguridad.

En el año 1996, Queens Developers, Inc. y 1014 Luquis, Inc., adquirieron ciertas unidades de vivienda dentro de la Urbanización Ciudad Cristiana. [4] Queens Developers las adquirió por medio de un contrato de compraventa, mientras que 1014 Luquis las adquirió por medio de ciertas escrituras de venta judicial y una escritura de traspaso de titularidad de bien inmueble en cumplimiento de una sentencia.

Las referidas entidades, mediante comunicaciones escritas y en reuniones con los representantes de la Autoridad, reclamaron de ésta que cumpliera con su obligación de mantener, custodiar, y conservar el sistema eléctrico de la referida Urbanización y que reparara y rehabilitara el mismo. Sin embargo, la Autoridad negó responsabilidad por la rehabilitación del sistema y requirió que los trabajos fueran costeados por Queens Developers, Inc. y 1014 Luquis, Inc. En vista de la negativa a asumir la responsabilidad de rehabilitar el sistema eléctrico, Queens Developers y 1014 Luquis realizaron los trabajos, apercibiéndole a la Autoridad que le reclamarían los costos.

---

[4] Las restantes unidades fueron adquiridas por otros compradores.

De conformidad con lo anterior, el 19 de julio de 1996, Queens Developers y 1014 Luquis presentaron ante el Tribunal de Primera Instancia, Sala Superior de Humacao, una demanda por incumplimiento de contrato y daños y perjuicios contra la Autoridad en la cual solicitaron el reembolso de las pérdidas sufridas al tener que incurrir en la rehabilitación del sistema eléctrico de la mencionada Urbanización. Alegaron que, a la fecha de la adquisición de las propiedades, las facilidades eléctricas, tales como los transformadores, unidades seccionadoras, pedestales, conductores, postes, entre otras, hasta el punto de entrega, donde ocurre la conexión del servicio de la Autoridad, se encontraban inservibles debido al deterioro, abandono y actos de vandalismo causados por la falta de mantenimiento, cuidado y supervisión, por parte de la Autoridad, lo cual causó que éstas tuvieran que incurrir en gastos sustanciales para reparar dicho sistema. Alegaron, además, que dichos gastos le ocasionaron serias pérdidas económicas y que la negativa de la Autoridad a resarcir los gastos constituía un enriquecimiento injusto por parte de esta entidad.

En específico, las mencionadas codemandantes alegaron que el punto hasta donde la Autoridad se había responsabilizado por las facilidades eléctricas existentes en las propiedades adquiridas por éstas, era hasta el punto

de entrega[5] en la línea de distribución o transmisión, por donde la Autoridad suplía a dichas propiedades la energía eléctrica, a tenor con la Sección IV (A) de los Términos y Condiciones Generales para el Suministro de Energía Eléctrica, en adelante, Reglamento de Términos.

Luego de varios incidentes y trámites procesales, la parte demandante presentó una moción de sentencia sumaria parcial. En la referida moción alegó, en síntesis, que en virtud de la escritura de constitución de servidumbre suscrita entre la Autoridad y M.D. Construction, una vez ocurrido el traspaso del sistema de distribución eléctrica a la Autoridad, era a esta entidad a quien correspondía la conservación y el mantenimiento del mismo. Lo anterior, por razón de que en la referida escritura, la primera se comprometió a conservar dicho sistema una vez aprobado el mismo.

Las codemandantes sostuvieron que de los Reglamentos aprobados por la Autoridad, surgía la obligación de ésta de mantener y conservar los sistemas de electricidad. En virtud de ello, la parte demandante solicitó del foro primario que se determinase que la Autoridad tenía que resarcir a dicha parte los gastos incurridos en la rehabilitación del sistema eléctrico hasta el punto de entrega de cada residencia y que señalase una vista para dilucidar la cuantía económica de dichos costos.

_____
[5] El punto de entrega en este caso, es el pedestal del cual discurre la línea secundaria a cada residencia, según admitió la AEE.

La Autoridad se opuso a la moción de sentencia sumaria presentada por las codemandantes.[6] Adujo como fundamento, por el cual no estaba obligada a darle conservación y mantenimiento a las facilidades eléctricas de Ciudad Cristiana, el hecho de que en esa área no había expectativas de vivienda ni expansión de servicio y que el haber dejado dicho sector energizado constituía un peligro para la sociedad. Expresó, además, que ante el cuadro de total abandono y actos de vandalismo que presentaba la situación existente en Ciudad Cristiana, lo más prudente y razonable fue lo que hizo: <u>retirar</u> el servicio de energía eléctrica y algunos de los transformadores del sistema eléctrico de dicha urbanización, toda vez que era <u>previsible</u> que, de no retirarse la electricidad de las referidas facilidades, podría ocurrir un accidente de consecuencias fatales.

La Autoridad, por último, sostuvo que de la escritura de compraventa suscrita por Queens Developers y de la escritura de traspaso suscrita por 1014 Luquis, surgía que ambas entidades aceptaron las propiedades bajo las condiciones existentes al momento de formalización del contrato de opción de compra ("as is"), por lo cual no podían ahora reclamar el resarcimiento por los gastos incurridos en la rehabilitación del sistema eléctrico donde se ubican dichas propiedades.

---

[6] El foro primario celebró vista argumentativa sobre la solicitud de sentencia sumaria parcial presentada por las demandantes el día 20 de marzo de 2001 y el 16 de septiembre de 2002.

El 5 de noviembre de 2002, el foro primario, luego de establecer que no había controversia sustancial de hechos materiales, concluyó que, de los Reglamentos de la Autoridad (Reglamento de Términos y el Reglamento Complementario) y de las escrituras en virtud de las cuales las codemandantes adquirieron las propiedades surgía que la responsabilidad de la reparación de rehabilitar el sistema eléctrico de la Urbanización Ciudad Cristiana correspondía a las codemandantes, y no a la Autoridad. Fundamentó su determinación en que el deber de previsibilidad que debía observar la Autoridad en relación con los demás ciudadanos justificaba que ésta retirara de la propiedad el servicio de energía eléctrica y algunos de los transformadores del sistema eléctrico. Por esta razón el foro primario dictó sentencia sumaria decretando la desestimación de la demanda instada contra la Autoridad.[7]

Inconformes, las codemandantes acudieron al Tribunal de Apelaciones, mediante recurso de apelación. El referido foro, luego de un análisis de los Reglamentos de la Autoridad y, en específico, de la escritura de constitución de servidumbre suscrita entre la Autoridad y M.D. Construction, concluyó que la responsable por los gastos incurridos en la reparación del sistema lo era la Autoridad. Determinó que de dicha escritura surgía claramente que la AEE se había comprometido a mantener y

---

[7] Además le impuso a la parte demandante el pago de las costas y gastos necesarios en la tramitación del pleito, más la suma de $2,500 por concepto de honorarios de abogado.

conservar el sistema eléctrico de Ciudad Cristiana una vez aceptara el mismo. Expresó que, siendo uno de los hechos incontrovertidos que la Autoridad, en efecto, aceptó el sistema eléctrico una vez lo aprobó, realizó la conexión del mismo y proveyó energía a los abonados, resultaba forzoso concluir que el traspaso pactado en la escritura de servidumbre había ocurrido, y que, una vez ocurrido este evento, la responsabilidad por la conservación, el mantenimiento, y reparación del sistema eléctrico era de la Autoridad, como dueña de todos los equipos de instalación eléctrica.

Expresó, además, el foro apelativo intermedio que las disposiciones de los Reglamentos citadas por el tribunal de instancia no eran aplicables al caso ya que las propiedades adquiridas por las codemandantes no eran nuevas y que al momento de ser adquiridas las mismas estaban gravadas por la servidumbre constituida por la Autoridad, lo cual le impuso el deber de conservar, mantener y reparar el servicio eléctrico independientemente de quién fuese el dueño.

Con respecto a la determinación del foro primario en cuanto a que, en virtud de las escrituras por las cuales las codemandantes adquirieron las propiedades --en las cuales éstas aceptaban las mismas bajos las condiciones existentes al momento de la formalización del contrato-- el foro apelativo determinó que esto significaba que correspondía a las codemandantes cualquier reparación por defecto o vicio aparente de la propiedad. Según dicho foro, esta cláusula no

podía extenderse para sostener que las codemandantes costeasen, además, los gastos surgidos debido al incumplimiento de las responsabilidades de la Autoridad.

El foro apelativo intermedio, en consecuencia, dictó sentencia revocatoria de la emitida por el tribunal de instancia, ordenando a la Autoridad a resarcir los gastos incurridos por las codemandantes, y devolviendo el caso a ese foro para que celebrase vista evidenciaria a los efectos de cuantificar dichos daños.

Inconforme con esta determinación, la Autoridad acudió, vía recurso de *certiorari*, ante este Tribunal. En el referido recurso, le imputa al foro apelativo haber errado al concluir que la rehabilitación del sistema eléctrico de la Urbanización Ciudad Cristiana le corresponde a la Autoridad y al concluir que ésta tenía que dar conservación y mantenimiento a las facilidades eléctricas que existían en dicha Urbanización, no obstante tener conocimiento de que en esa área no había expectativas de viviendas ni expansión de servicio por razón de haberse determinado la existencia de mercurio en dicha Urbanización.

Expedimos el recurso. Estando en posición de resolver el recurso radicado, procedemos a así hacerlo.

I

En primer lugar, atendemos los planteamientos de la Autoridad en cuanto a que ciertas cláusulas del contrato de opción suscrito por Queens Developers y el posterior

contrato de compraventa suscrito por ésta, además de la escritura de traspaso mediante la cual adquirió 1014 Luquis, son indicativas de que: primero, que las recurridas aceptaron las propiedades adquiridas en las condiciones en que estas se encontraban al momento de otorgarse las escrituras, y, segundo, que esto último evidencia que las recurridas son responsables de reparar el sistema eléctrico de la Urbanización. Examinemos las referidas cláusulas.

La cláusula undécima en el contrato de opción de compra[8], suscrito entre Queens Developers y el Banco de la Vivienda, dispone lo siguiente:

> La segunda parte (Queens Developers) <u>queda autorizada a efectuar las mejoras que estime necesarias en las unidades que se propone adquirir</u>, dichas mejoras y/o reparaciones quedarán quedaran a beneficio de la primera parte (Banco de la Vivienda) sin que tenga que compensar a la segunda parte si esta última opta por no ejercitar su derecho de opción. (Énfasis nuestro).

Por su parte, las cláusulas sexta y séptima de la escritura de compraventa suscrita por Queens Developers y el Banco de la Vivienda[9], respectivamente, disponen que:

> Sexta: Las <u>unidades de vivienda</u> se venden en las condiciones en que se encuentran ("as is") y así son aceptadas por la parte compradora. (Énfasis nuestro).

> Séptima: La parte compradora será responsable de gestionar y obtener todos aquellos permisos de agencias gubernamentales y otras entidades que no están disponibles a esta fecha.

---

[8] Suscrita el 31 de diciembre de 1992.

[9] Escritura Número 35 del 17 de febrero de 1994, otorgada ante la notario Rita Lynne Rodríguez de la Rocha.

De otro lado, las escrituras de venta judicial, en virtud de las cuales adquirió 1014 Luquis, sólo expresan que se transfieren las referidas fincas a la parte compradora "con todas sus pertenencias y cuánto la constituye". En específico, la cláusula cuarta de la escritura de traspaso de titularidad de bien inmueble dispone que el alguacil "da, cede y traspasa a la parte adquirente el inmueble antes descrito, con todos sus derechos inherentes y anejos y la parte adquirente, asimismo en cumplimiento de la antes mencionada Estipulación y Sentencia, acepta el inmueble en pago de la deuda…"

Somos del criterio que las anteriores cláusulas nada tienen que ver con las condiciones del sistema eléctrico de la Urbanización adquirida por Queens Developers y 1014 Luquis. Como bien determinó el foro apelativo, dichas cláusulas versan sobre las condiciones de las unidades de vivienda en sí, las cuales fueron aceptadas según éstas se encontraban al momento de otorgarse las referidas escrituras. En específico, la cláusula undécima de la escritura de opción sólo autorizaba a Queens Developers a realizar las mejoras que estimase necesarias en las unidades de vivienda que se proponía adquirir.

No podemos extender el significado de las referidas cláusulas, tal y como lo propone la Autoridad, como para que incluyan: primero, la aceptación del sistema de distribución de energía eléctrica general de la Urbanización, y segundo,

que la autorización para realizar las mejoras incluya la reparación de dicho sistema.

En consecuencia, concluimos que las escrituras en virtud de las cuales las codemandantes recurridas adquirieron las propiedades, no sostienen la posición de la Autoridad en cuanto a que las mismas le imponen a las primeras la obligación de realizar las reparaciones al sistema eléctrico de la Urbanización.

II

A

La Autoridad de Energía Eléctrica fue creada con el fin de conservar, desarrollar, y utilizar, así como para ayudar en la conservación, desarrollo, y aprovechamiento de las fuentes fluviales y de energía de Puerto Rico, para hacer asequible a los habitantes del Estado Libre Asociado, en la forma económica más amplia, los beneficios de aquéllos. Sección 6 de la Ley de la Autoridad de Energía Eléctrica de Puerto Rico, Ley Núm. 83 del 2 de mayo de 1941, según enmendada, 22 L.P.R.A. secc. 196.

Entre las facultades que la Ley Núm. 83, ante, concede a la Autoridad, el Inciso (l) de la Sección 6 dispone que podrá determinar, fijar, alterar, imponer y cobrar tarifas razonables, derechos, rentas y otros cargos por el uso de las facilidades de la Autoridad o por los servicios, energía eléctrica u otros artículos, vendidos, prestados, o suministrados por la Autoridad, que sean suficientes para

cubrir los gastos incurridos por la Autoridad, en la preservación, desarrollo, mejoras, extensión, reparación, conservación, y funcionamiento de sus instalaciones y propiedades… (citas omitidas).

En virtud de las facultades para formular, adoptar, enmendar, y derogar, estatutos y reglamentos[10], otorgadas por su ley orgánica, la Autoridad adoptó tanto el Reglamento de Términos como el Reglamento Complementario.[11]

De entrada, atendemos la interrogante sobre si el Reglamento de Términos y el Reglamento Complementario sostienen, o no, la conclusión a la que llegó el foro primario a los efectos de que los mismos le imponen la responsabilidad del costo de la rehabilitación del sistema eléctrico de la Urbanización Ciudad Cristiana a Queens Developers y a 1014 Luquis. Veamos.

Las disposiciones reglamentarias que la Autoridad invocó en apoyo de su posición son las Secciones II (A) y (F) del Reglamento de Términos sobre solicitudes de servicio. La Sección II (A) dispone, en lo pertinente, que:

---

[10] Sección 6, Inciso (c) de la Ley Núm. 83, ante, 22 L.P.R.A. secc. 196.

[11] El fin del Reglamento de Términos y Condiciones Generales para el suministro de energía eléctrica es el establecer aquellas condiciones generales y especiales que sean de interés para el usuario y la Autoridad de Energía Eléctrica. El Reglamento Complementario establece que sus disposiciones aplican y cubren toda obra de electricidad, tales como instalaciones soterradas, subterráneas y seccionadoras ("switch units"), instalaciones de postes, alumbrado o líneas aéreas, metro eléctrico o medidor, re-inspecciones de instalaciones o monturas para contadores, o sea, toda construcción que tenga que ver con la instalación de conductores, materiales y equipo eléctrico.

Puede obtenerse servicio de energía eléctrica bajo cualquiera de las tarifas de servicio a distribución secundaria mediante una Solicitud de Servicio, por vía telefónica, escrita o visita personal a las oficinas comerciales. El servicio ha de prestarse al voltaje de distribución de la Autoridad, cuando existe capacidad disponible en los equipos o líneas de la Autoridad <u>y si no fuere necesario extender las líneas eléctricas</u>.(…)

Los costos de las <u>extensiones</u> de líneas, <u>mejoras</u> o cualquier otro costo necesario para proveer el servicio solicitado será aportado por el abonado solicitante por cualquiera de los medios establecidos por los Reglamentos de la Autoridad para facilitar este servicio. (citas omitidas).

Somos del criterio que la anterior disposición <u>no</u> aplica a la reclamación de las codemandantes. El presente caso no trata de una extensión de las líneas de la Autoridad para que pueda proveerse el servicio a las propiedades. Tampoco se trata de una nueva solicitud de servicio ni de una mejora realizada a las líneas.[12] <u>La reclamación de las codemandantes versa sobre el gasto incurrido en la reparación y rehabilitación del sistema de distribución</u>

---

[12] El Reglamento Complementario, en su parte introductoria, establece que las construcciones eléctricas se dividen en tres tipos. Estos son:
1. Construcción de Instalaciones Eléctricas- que cubre las instalaciones interiores e instalaciones exteriores inherentes.
2. Construcción de Sistemas de Distribución Eléctrica- que cubre la instalación de facilidades eléctricas para servir los proyectos de urbanizaciones y lotificaciones simples.
3. Construcción de Extensiones de Líneas Eléctricas- que cubre la instalación de líneas para llevar las facilidades eléctricas desde las líneas de la Autoridad hasta las urbanizaciones, lotificaciones y edificios.

eléctrica general de la Urbanización —hasta el punto de entrega de cada unidad de vivienda— el cual se encontraba inservible al momento de la adquisición de las unidades de vivienda.

La sección II (F) tampoco sostiene la posición de la Autoridad. La misma dispone que:

> Toda solicitud de servicio de electricidad para edificios, estructuras, residencias, etc., nuevo o que nunca hayan tenido servicio de electricidad, o que hayan estado desocupadas por más de un (1) año se le requerirá permiso de uso de la Administración de Reglamentos y Permisos (ARPE) y Certificación de Instalación Eléctrica.

De la disposición antes transcrita sólo se desprende una obligación del futuro abonado o dueño de la propiedad de adquirir cierta documentación para que puedan realizarse instalaciones de servicio de electricidad en nuevas propiedades o propiedades que hubieren estado desocupadas por más de un año. La documentación requerida consiste en un permiso de uso que expedirá ARPE y un certificado de instalación eléctrica. Esta disposición específica no le impone la responsabilidad a las codemandantes de sufragar los gastos de reparaciones o rehabilitaciones necesarias al sistema general de electricidad de la Urbanización. Surge claramente que la misma se refiere a la documentación que deberá proveer un abonado para que la Autoridad provea el servicio de energía eléctrica. La interpretación de esta disposición que hicieron tanto la Autoridad como el foro primario es claramente errónea.

B

Ahora bien, la Autoridad niega que ésta tenga responsabilidad alguna sobre la reclamación hecha por Queens Developers y 1014 Luquis, la cual comprende los gastos incurridos en la reparación de las instalaciones pertenecientes a la Autoridad hasta el llamado punto de entrega.

Resulta importante enfatizar que ni el Reglamento Complementario ni el Reglamento de Términos establecen claramente cuál es el punto donde cada parte se hace responsable por el mantenimiento de las instalaciones eléctricas. Debido a ello, atendemos las disposiciones generales del Reglamento Complementario, las cuales disponen que la Autoridad no hace trabajos de instalaciones <u>interiores</u> ni asume responsabilidad alguna por las condiciones de instalaciones eléctricas <u>dentro</u> de los edificios. Entre las disposiciones generales se establece también que será requisito indispensable que todas las instalaciones eléctricas, tanto las nuevas como las reparadas sean realizadas y certificadas por un perito electricista colegiado o un ingeniero electricista colegiado y aceptadas por la Autoridad <u>antes de ser conectadas al sistema eléctrico perteneciente a ésta</u>.

Se advierte de lo anterior, que el abonado o dueño será responsable por las instalaciones eléctricas que se encuentren dentro de su propiedad, y que las mismas tendrán que ser inspeccionadas y aceptadas por la Autoridad antes de

que sean conectadas al sistema eléctrico de la Autoridad. La Sección 3.2 (11) añade que es responsabilidad única y exclusiva de la Autoridad, realizar la conexión entre la instalación del abonado o el dueño y las redes de distribución o transmisión de la Autoridad.

Ahora bien, el Reglamento de Términos, dispone en la Sección IV (A), que el punto de entrega es aquel donde la Autoridad le entrega al abonado la energía eléctrica que éste va a utilizar. El mismo varía según el tipo de sistema eléctrico construido en la urbanización, edificio o estructura de que se trate. El Inciso (C) de esta sección dispone que la energía se entregará en el punto donde comienza la instalación del abonado. Este punto se conoce como el punto de entrega. El punto de entrega para abonados residenciales es aquel donde la línea de la Autoridad conecta a las instalaciones propiedad del abonado.

El Reglamento Complementario, en el Artículo 3.4(3) amplía esta definición y dispone que:

> El punto de entrega en los sistemas soterrados se define como el punto donde se unen los conductores de la instalación soterrada a las líneas de la Autoridad. Cuando la toma sea secundaria el punto de entrega será el pedestal o transformador... (citas omitidas)[13]

Es un hecho incontrovertido que el sistema eléctrico de Ciudad Cristiana, es semi-soterrado con líneas aéreas

---

[13] Anteriormente expresamos que la toma de servicio soterrada son aquellos alimentadores para el servicio eléctrico de los edificios, que sean instalados bajo tierra o empotrados en hormigón. Artículo 3.4 (1) del Reglamento de Condiciones.

primarias y transformadores adheridos al poste de donde discurre una línea soterrada secundaria hasta un pedestal primario y luego, a uno secundario hasta llegar al punto de entrega de las residencias. El punto de entrega en el caso del sistema eléctrico de Ciudad Cristiana es el pedestal.

Somos del criterio que lo anteriormente expuesto deberá interpretarse a los efectos de que el abonado o dueño será responsable del costo, mejoras o reparación de las instalaciones internas de su propiedad y de las extensiones necesarias para que las mismas sean conectadas al sistema que pertenece a la Autoridad. Las instalaciones eléctricas pertenecientes a la Autoridad, que comprenden aquellas líneas y otros elementos que discurren hasta el punto de entrega, donde éstas se conectan a las instalaciones internas de la propiedad, son de la responsabilidad de ésta entidad.

Resolvemos, en consecuencia, que no erró el foro apelativo intermedio al determinar que las disposiciones reglamentarias antes citadas no imponen la obligación de reparación del sistema eléctrico de la Autoridad a Queens Developers y a 1014 Luquis, toda vez que la referida responsabilidad es de la Autoridad.

III

Refuerza nuestra determinación a los efectos de que la Autoridad es responsable por la reparación y rehabilitación de su sistema de distribución de energía eléctrica el hecho

que ésta suscribió una escritura de constitución de servidumbre de paso de energía eléctrica con M.D. Construction. En virtud de ella, la Autoridad se obligó a dar mantenimiento y a conservar los sistemas de electricidad instalados en la Urbanización Ciudad Cristiana, una vez dichas instalaciones fuesen traspasadas a la entidad.[14]

Dispone la primera cláusula de la referida escritura que el Propietario, mediante la misma, y en consideración a los fines públicos a que había de ser destinado el sistema eléctrico objeto de la servidumbre, constituía servidumbre predial a perpetuidad para el paso, instalación, operación y reparación de las líneas y artefactos del mencionado sistema eléctrico a favor de la Autoridad, sus cesionarios, y sucesores en el título sobre la Finca.

En especial, la cláusula decimotercera de la escritura de servidumbre dispone lo siguiente:

> El propietario por la presente cede y traspasa a la Autoridad el sistema de distribución construido en la finca con todo su equipo, materiales, y accesorios. La cesión y traspaso será efectiva en la fecha en que la Autoridad inspeccione y acepte dicho sistema de distribución y el mismo sea conectado e incorporado al sistema eléctrico de la Autoridad. Como consideración a dicho traspaso, la Autoridad se compromete a dar conservación a dicho sistema de distribución a partir de la referida fecha de aceptación del sistema, sujeto a las

---

[14] Enfatizamos que el traslado surtiría efectos una vez la AEE aceptara dichas instalaciones. Como señaláramos anteriormente, la AEE inspeccionó y aceptó el sistema eléctrico. La mejor evidencia de ello es que la AEE suplió los servicios de energía eléctrica a algunas de las unidades de vivienda de la Urbanización Ciudad Cristiana.

disposiciones de la cláusula DUODÉCIMA de este documento.[15] (Énfasis nuestro).

Se desprende claramente de la cláusula antes transcrita que, en virtud de la escritura de constitución de servidumbre, la Autoridad contrajo la obligación de conservar y dar mantenimiento al sistema de distribución de energía eléctrica de la Urbanización Ciudad Cristiana. Además, en virtud de la misma, la Autoridad también advino dueña de dicho sistema.

La servidumbre de paso para las líneas de energía eléctrica tiene carácter de servidumbre legal, continua y aparente, constituida a base de las disposiciones de la Ley Núm. 143 del 20 de julio de 1979. Todo lo concerniente a las servidumbres establecidas para utilidad pública o comunal se

---

[15] La cláusula duodécima dispone que:

A. El propietario, por la presente, certifica que el sistema de distribución construido en la Finca se encuentra en perfecto estado de funcionamiento y concede a la Autoridad como garantía el término de un (1) año a partir de la fecha de la conexión del sistema de distribución de la urbanización al sistema de distribución de la Autoridad o a partir de la fecha del otorgamiento de esta escritura, la que resulte posterior. El Propietario se compromete mediante un documento firmado por su contratista electricista a rembolsar prontamente a la Autoridad cualesquiera gastos en que incurra durante dicho período de un (1) año debido a materiales y equipos defectuosos en su fabricación o instalación de dicho sistema de distribución, así como para corregir defectos de mano de obra.

B. Dicha garantía cubre, además, el reembolso de cualesquiera gastos que la Autoridad tenga que hacer con el propósito de conectar el sistema de distribución de la Autoridad, así como el desplazamiento de líneas que interfieran con la construcción de la urbanización.

regirá por las leyes y reglamentos especiales que las determinan, y en su defecto, por las disposiciones de la presente parte. Artículo 486 del Código Civil, 32 L.P.R.A. secc. 1702.

Las servidumbres para el servicio de energía eléctrica permiten cumplir con los fines y propósitos para los cuales fue creada la Autoridad de Energía Eléctrica de Puerto Rico. Sección I, Artículo A del Reglamento de Servidumbres de la Autoridad de Energía Eléctrica.[16] Este Reglamento describe los requisitos mínimos con los que deben cumplir las servidumbres para las estructuras, líneas, equipos y otros artefactos que pertenecen a la Autoridad. Dichos equipos y artefactos incluyen los instalados por contratistas privados que son transferidos a la Autoridad, además de las instalaciones hechas por ésta como parte de su programa de construcción y mantenimiento. *Ibíd*.

El Reglamento de Servidumbres de la Autoridad, en la Sección II (F) define la servidumbre de paso de líneas eléctricas como un derecho real que se establece sobre las franjas o porciones de terreno donde están ubicadas o se ubicarán las instalaciones de la Autoridad, tales como: líneas, postes, torres, equipos y aditamentos. Estas servidumbres se constituyen con el propósito de que la

---

[16] Dicho Reglamento, aprobado el 18 de noviembre de 2003, derogó el Reglamento de Servidumbres para el Servicio de Energía Eléctrica del 22 de mayo de 1995, Núm. 5239 el cual, a su vez, derogó los reglamentos relativos a servidumbres, anteriores a su vigencia. No obstante lo anterior, las disposiciones citadas son esencialmente las mismas contenidas en los derogados Reglamentos.

Autoridad tenga acceso razonable <u>a sus instalaciones, para,</u>
<u>entre  otras,  darle  mantenimiento,  reparar,  mejorar,</u>
<u>expandir, operar y ampliar sus instalaciones</u>. *Ibíd*.

En dicho Reglamento, se dispone que las servidumbres de
paso para el servicio de energía eléctrica gravan el predio
sirviente y deben ser observadas por la persona natural o
jurídica cuyas acciones u omisiones puedan afectar el
derecho de servidumbre y se establecen sobre los predios
sirvientes para <u>el paso, instalación, operación y reparación</u>
<u>de las instalaciones de la Autoridad</u>. Sección III, Artículo
A.

La Sección V B(2) del Reglamento dispone, a su vez,
que:

La Autoridad  tiene  el <u>derecho  de  acceso</u> a  la
servidumbre <u>para  efectuar  los  trabajos  de</u>
<u>operación, conservación, construcción, mejoras o</u>
<u>reparación  de  instalaciones</u>.  El  acceso  a  la
servidumbre debe permitir a la Autoridad utilizar
el equipo necesario para realizar estos trabajos.
(Énfasis nuestro).

Las disposiciones reglamentarias citadas anteriormente,
las cuales establecen el propósito por el cual se establecen
las servidumbres a favor de la Autoridad, disponen que las
mismas se constituyen para que esta entidad tenga acceso a
las  instalaciones <u>de  su  propiedad</u> para  poder  darles
mantenimiento, hacer las reparaciones y mejoras necesarias,
expansiones, etc.

En el presente caso, no hay duda de que el terreno
donde  ubican  las  propiedades  adquiridas  por  Queens
Developers  y  1014  Luquis <u>continuaba  gravado  por  la</u>

servidumbre aun cuando el mismo atravesó por un periodo de abandono y aun cuando las instalaciones eléctricas fueron retiradas por razones de seguridad. En vista de ello, la Autoridad tenía la obligación de rehabilitar el sistema de electricidad que le fue traspasado en virtud de la referida escritura una vez la Urbanización fue rehabitada y así le fuere solicitado por las recurridas. Lo anterior, en virtud de uno de los propósitos para el cual fue creada la Autoridad: el proveer energía eléctrica a los habitantes del Estado Libre Asociado de Puerto Rico[17]. Por consiguiente, concluimos que la Autoridad es responsable de los costos de reparación de las instalaciones eléctricas de la Urbanización, las cuales son de la propiedad de dicha entidad.

Habiéndose resuelto anteriormente que las instalaciones eléctricas propiedad de la Autoridad comprenden el sistema de distribución eléctrico que le fue traspasado y aquellas líneas y otros elementos que discurren hasta el punto de entrega --punto en el cual las líneas de la Autoridad se conectan con la instalación del abonado[18] -- resolvemos, específicamente, que la Autoridad deberá resarcir a Queens Developers y a 1014 Luquis los gastos incurridos en la rehabilitación y reparación del sistema de distribución de energía eléctrica de la Urbanización hasta el punto de

---

[17] Ley Orgánica de la Autoridad de Energía Eléctrica de Puerto Rico, ante.

[18] En este caso, el pedestal.

<u>entrega de cada una de las unidades de vivienda adquiridas por éstas</u>.

Por ello, el tribunal de instancia deberá determinar el costo de la reparación desde lo que comprende el sistema eléctrico de la Autoridad hasta el referido punto de entrega.

Por los fundamentos anteriormente expresados, procede dictar Sentencia confirmatoria de la emitida por el Tribunal de Apelaciones en el presente caso y devolver el mismo al foro de instancia para la continuación de los procedimientos consistentes con lo aquí resuelto.

Se dictará Sentencia de conformidad.


                    FRANCISCO REBOLLO LÓPEZ
                         Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Queens Developers, Inc. y
1014 Luquis, Inc.

    Demandantes-recurridos

       vs.                      CC-2004-152   CERTIORARI

Autoridad de Energía Eléctrica

    Demandados-peticionarios


SENTENCIA

San Juan, Puerto Rico, a 21 de noviembre de 2005


      Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia confirmatoria de la emitida por el Tribunal de Apelaciones en el presente caso y se devuelve el mismo al foro de instancia para la continuación de los procedimientos consistentes con lo aquí resuelto.

      Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo Interina. El Juez Presidente señor Hernández Denton disiente sin opinión escrita.


Dimarie Alicea Lozada
Secretaria del Tribunal Supremo Interina